CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

OCT 13 2011

JULIA C. DUDLEY, CLERK
BY:
  DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| SNC-LAVALIN AMERICA, INC., | ) |
| | ) |
| Plaintiff/ Counter-Defendant, | ) Civil Action No. 7:10CV00540 |
| | ) |
| v. | ) **MEMORANDUM OPINION** |
| | ) |
| ALLIANT TECHSYSTEMS, INC., | ) By: Hon. Glen E. Conrad |
| | ) Chief United States District Judge |
| Defendant/ Counter-Plaintiff. | ) |

SNC-Lavalin America, Inc. ("SNC") filed this diversity action against Alliant Techsystems, Inc. ("ATK"), asserting claims of breach of contract, unjust enrichment, and promissory estoppel. The action stems from the design and construction of a new nitric acid and sulfuric acid concentration plant ("NAC/SAC") at the Radford, Virginia arsenal owned by the United States Army and operated by ATK. SNC and ATK entered into a written contract pursuant to which SNC agreed to provide engineering, procurement, and construction services. The primary source of the instant dispute is SNC's demand for payment for additional costs that the company allegedly incurred as a result of (1) an ATK-directed change to the type of floor coating used on the first floor of the NAC/SAC; and (2) ATK's denial of a requested extension of the contract time due to severe winter weather.

The case is presently before the court on ATK's motion for partial summary judgment. The court held a hearing on the motion on October 4, 2011. For the reasons that follow, the motion will be granted in part and denied in part.

## Factual Background

### I. The Parties and the Project

ATK is a Delaware corporation with its principal place of business in Minneapolis, Minnesota. SNC is a Colorado corporation with its principal place of business in Pittsburgh, Pennsylvania.

ATK operates the Radford Army Ammunition Plant on behalf of the Army. The NAC/SAC component that is the subject of the instant action is an acid processing and recycling facility. The acid from the plant is used to manufacture explosives and propellants.

In 2005, ATK hired the consulting firm of Washington Group, Inc. ("WGI") to advise ATK on the modernization of the NAC/SAC. The project included an evaluation of the equipment floor at the NAC/SAC, which had been destroyed by years of exposure to corrosive materials leaking from pipes and machinery.

WGI and ATK prepared the specifications for the NAC/SAC modernization project and incorporated them into the Engineering Functional Specifications ("EFS") that formed the baseline for the project. The purpose of the EFS was to present a 10% design that two bidding groups could utilize to construct a 30% design. From the competing 30% design submissions, ATK, WGI, and the Army selected a winning design-build team. SNC won the competition, along with its technology partner, a German company by the name of Plinke.

### II. The Contract

On October 2, 2008, ATK and SNC entered into a written design-build contract (the "Contract"), pursuant to which SNC was engaged to provide engineering, procurement, and construction services for the NAC/SAC project. The Contract is comprised of a number of

documents, including the "Terms and Conditions For Design/Build Option Contract" ("Terms and Conditions").

Section 12 of the Terms and Conditions governs changes to the Contract. Pursuant to § 12.1, titled "ATK-Directed Changes," ATK "may, at any time, by written order and without notice to the sureties, make changes within the general scope of the types of services provided by [SNC]" under the Contract. SNC is required to implement such changes in accordance with ATK's instructions. (Terms and Conditions § 12.1.)

Changes to the Contract Time are covered by § 12.2 of the Terms and Conditions. That section provides as follows:

> Time is of the essence in the performance of this Contract. All Work must be completed within the Contract Time as set forth in the Contract. If, during the course of performance, an event occurs that is 1) beyond the control of Contractor and 2) not the result of any action or inaction by Contractor or those responsible to the Contractor, including its subcontractors, then the Contractor shall be entitled to an adjustment to the Contract Time (subject to other requirements herein) to the extent there is either unavoidable delay or a time savings to the Project Schedule and the procedures are followed by the Contractor. Such changes to the Contract Time may be permitted if any of the following circumstances impact the timely completion of the Work:
>
> (a) Issuance of an ATK-directed Change Order;
>
> (b) Suspension of Work per Section 14.0 of this Contract;
>
> (c) Differing Site Condition per Section 11.0 of this Contract;
>
> (d) Acts of God or of the public enemy; fires; floods; epidemics; quarantine restrictions; strikes unrelated to Contractor's conduct; freight embargos; and unusually severe weather.
>
> (e) A breach of the Contract terms by ATK;

3

or

> (f) Acts or omissions of the Government, including changes to government regulations.

(Terms and Conditions § 12.2.)

Changes to the Contract Price are discussed in § 12.3 of the Terms and Conditions. That section provides that the Contract Price "shall only be changed (subject to other requirements herein) as a result of a reasonably unavoidable material increase or decrease in the Contractor's cost of performing the Work that results from one of the following events":

> (a) Issuance of an ATK-directed Change Order;
>
> (b) Suspension of Work per Section 14.0 of this Contract;
>
> (c) Differing Site Condition per Section 11.0 of this Contract;
>
> (d) A breach of the Contract terms by ATK;
>
> (e) Commodity price increases/decreases per Section 12.8 below; or
>
> (f) Acts or omissions of the Government, including changes to governmental regulations.

(Terms and Conditions § 12.3.)

Sections 12.4 and 12.5 of the Terms and Conditions set forth the notice requirements applicable to changes to the Contract Price or Contract Time. Section 12.4 states as follows:

> When Contractor becomes aware of a changed condition that may result in the increase or decrease in the Contract Price or Contract Time, Contractor shall promptly notify ATK of such circumstances. In no circumstances may such notice be provided more than 15 days from the date the Contractor becomes aware of the events giving rise to the changed condition. Failure to provide notice within the prescribed time period will serve as an absolute bar and complete waiver of Contractor's right to recover for any increases in the Contract Price or Contract Time resulting from the change.

(Terms and Conditions § 12.4.)

4

Section 12.5 states that the notice provided pursuant to § 12.4 "shall be on a form boldly entitled 'Notice of Potential Change,'" and "must bear a distinct number." The section further states that "[w]here possible, the Notice should provide a ROM (rough order of magnitude) estimate of the cost of the change and a statement of whether there is potential for delay to the project schedule." (Terms and Conditions § 12.5.)

Section 12.7 of the Terms and Conditions discusses agreements to change orders. The provision requires ATK to promptly issue a written change order memorializing any agreement upon a change in the work and any resulting changes in the Contract Price or Contact Time. In the event the parties are unable to agree upon appropriate changes to the Contract Price or Time, the matter must be handled under § 20 of the Terms and Conditions, which governs disputes. The section further provides that, absent an agreement on a change order, SNC "still has a duty to proceed with the Work as directed by ATK pending resolution of the dispute." (Terms and Conditions § 12.7.)

Section 20 of the Terms and Conditions directs the parties to attempt to resolve any disputes through negotiation. In the event the parties are unsuccessful, "the parties agree that the forum and venue for any action at law or equity arising out of or relating to" the Contract shall be the federal or state courts in Virginia that would otherwise have jurisdiction over the matter. (Terms and Conditions § 20.2.) The parties likewise agree that the Contract shall be interpreted and governed by the law of Virginia. (Terms and Conditions § 1.4.) Notwithstanding the existence of a dispute between the parties, SNC is required to "perform as directed by ATK in a diligent manner and without delay." (Terms and Conditions § 20.3.)

5

### III. Communications Regarding Acid-Resistant Concrete

As previously indicated, SNC was responsible for creating a 30% design plan based on the specifications in the EFS. In June of 2007, the EFS specified epoxy-coated concrete for the the NAC/SAC's ground floor. The chosen coating was to be warranted for repair or replacement for three years.

When SNC submitted its 30% design to ATK, the design included a rendering of the ground floor of the NAC/SAC that featured concrete flooring covered by an epoxy coating made by Carboline. ATK accepted SNC's 30% design submission for the ground floor, including the designation of a Carboline floor coating, and the 30% design was incorporated by reference into the October 2, 2008 Contract.

On January 12, 2009, SNC issued a request for information to ATK, in which it asked for clarification of the durability expected of the epoxy coating used on the ground floor. In response, ATK indicated, for the first time, that the coating should withstand spill exposure for four hours.

SNC's vendors prepared Carboline samples to send to ATK for testing on the four-hour protocol. After all of the samples failed to withstand spill exposure for four hours, SNC consulted numerous manufacturers. None of the manufacturers had an epoxy coating that could pass the four-hour test.

During the parties' 60% design meeting in April of 2009, ATK asked SNC to explore different floor coating options. On June 2, 2009, SNC provided rough order of magnitude ("ROM") estimates for two alternatives. The first consisted of adding a Viton coating in high risk areas; the second included the use of acid-resistant concrete on the first and second floors,

6

along with a Viton coating in high risk areas. SNC noted that the decision to implement the second alternative would need to be made as soon as possible, and that the construction schedule could be impacted depending on the chosen flooring option.

By email dated June 11, 2009, ATK asked SNC to provide estimate pricing for three flooring options, all of which would include the use of acid-resistant concrete on the ground floor of the NAC/SAC. SNC responded to the request on June 24, 2009 by providing ROM pricing estimates for each of the three options. In its letter, SNC emphasized that "[t]he decision to use [acid-resistant] concrete needs to be made relatively soon as this work is currently being tendered," and that a "[f]inal decision should be made three-four weeks in advance of the mid-September target date [for] this work." (Yu Aff. Attach. C.)

By letter dated July 15, 2009, ATK advised SNC that it was interested in the third flooring option previously discussed by the parties. The option consisted of "AR concrete top 2 [inches] of the L1 grade slab," and a "Viton top coat on 100% of the L1 and L2 floors and pads." (Yu Aff. Attach. D).

After receiving additional input and further direction from ATK, SNC went to work redesigning the ground floor. The design changes included the use of three inches of acid-resistant concrete; a Viton membrane between the acid-resistant concrete and the structural slab; and extensive trenching, coating, and equipment designs to protect against acid penetration. The design changes were approved by ATK, but the parties were unable to agree on the additional costs required to install the acid-resistant concrete. Nonetheless, SNC proceeded to perform the requested upgrades.

7

## IV. Communications Regarding Winter Weather

After SNC began installing the acid-resistant concrete, Radford experienced several severe snow storms and below average temperatures. In December of 2009, January of 2010, and February of 2010, there were over 40 days of snowfall, with over 20 inches of snow in December alone.

By letter dated February 25, 2010, SNC requested a 30-day extension for the completion of the project due to severe winter weather. Along with the letter, SNC provided weather data for the 90-day period in graphic and tabular form. (Yu Aff. Attach. E). ATK denied the requested extension on March 15, 2010.

## V. SNC's Delay Claim

On July 30, 2010, SNC submitted a draft delay claim to ATK, seeking over $4.1 million in delay damages. SNC asserted that the damages resulted from the severe winter weather and the change in floor coating from epoxy to acid-resistant concrete. On September 30, 2010, SNC submitted a final delay claim that included an increased demand of $4.7 million.

## Procedural History

SNC filed the instant action on December 6, 2010, asserting claims of breach of contract, unjust enrichment, and promissory estoppel. In the breach of contract counts, SNC seeks payment for extra work that it was required to perform at ATK's direction and as a result of changed conditions. SNC also contends that ATK breached the contract by failing to grant an extension of time for the severe weather, and that SNC incurred additional costs resulting from the denied extension.

On February 14, 2011, ATK filed counterclaims against SNC. The counterclaims include claims for breach of contract, promissory estoppel, and breach of warranty.

The case is presently before the court on ATK's motion for partial summary judgment. A jury trial is scheduled to begin on Monday, October 17, 2011.

## Standard of Review

An award of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For a party's evidence to raise a genuine issue of material fact to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether to grant a motion for summary judgment, the court must view the record in the light most favorable to the non-moving party. Terry's Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610 (4th Cir. 1985).

## Discussion

ATK has moved for partial summary judgment with respect to certain categories of damages outlined in SNC's expert report. The categories include delay damages resulting from the change to acid-resistant concrete; additional costs incurred as a result of the severe winter weather; and acceleration costs incurred as a result of the denial of the requested extension of time. ATK has also moved for summary judgment with respect to SNC's unjust enrichment claim.

9

Case 7:10-cv-00540-GEC Document 54 Filed 10/13/11 Page 9 of 19 Pageid#: 1052

I. **Change to Acid-Resistant Concrete**

To the extent that SNC seeks damages resulting from ATK's delay in deciding to install acid-resistant concrete and the additional time required to install this floor covering, ATK argues that such damages are barred by SNC's failure to comply with the Contract's written notice requirements.[1] As stated above, § 12 of the Terms and Conditions contains provisions requiring SNC to provide written notice within 15 days of becoming aware of a changed condition that may result in an increase or decrease of the Contract Price or Contract Time. The Terms and Conditions also state that the "[f]ailure to provide notice within the prescribed time period will serve as an absolute bar and complete waiver of Contractor's right to recover for any increases in the Contract Price or Contract Time resulting from the change." (Terms and Conditions § 12.4.)

Courts applying Virginia law have held that, in the absence of waiver, written notice requirements are binding and enforceable. As the United States District Court for the Eastern District of Virginia emphasized in West v. United States Postal Service, 907 F. Supp. 154 (E.D. Va. 1995):

> Numerous cases have come before the courts where a contractor has been denied recovery for additional work under a contract because of failure to give the required notice of the costs before the work was done. In such cases the courts have generally held that giving the notice requires strict compliance and giving of the notice is a condition precedent.

Id. at 159; see also McDevitt & Street Co. v. Marriott Corp., 713 F. Supp. 906, 919 (E.D. Va. 1989) (holding that the contractor's failure to provide written notice required under the contract barred its subsequent claim for additional compensation); United States v. Centex Constr. Co.,

---

[1] During the course of litigation, ATK and SNC resolved their dispute regarding SNC's claim for the direct costs of labor and materials incurred in installing acid-resistant concrete. SNC's claim for delay damages resulting from the change is the subject of the instant motion.

10

638 F. Supp. 411, 413 (W.D. Va. 1985) (emphasizing that "Virginia courts have upheld [damage notification] clauses between contractors and subcontractors for nearly a hundred years" and holding that the subcontractor's claims for additional payments were subject to dismissal for failure to comply with the contract's notice provision).

In the instant case, it is undisputed that SNC failed to provide formal, written notice that the decision to install acid-resistant concrete delayed SNC's work, or that the alleged additional time required to install the concrete delayed SNC's work.[2] In an attempt to avoid summary

---

[2] In response to questions from ATK's counsel during his deposition, Kevin Wallace, SNC's Vice President and General Manager responsible for the NAC/SAC project, responded as follows:

Q. The other delay was a delay associated with the fact that it took seven weeks to do the AR [acid-resistant] concrete work versus one week that was anticipated for the epoxy work, correct?

A. Correct.

Q. When was the first written notice of that delay provided to ATK?

A. As you're wording that . . . I don't know if there was formal notice provided to ATK. I am confident that it would have been discussed on an ongoing basis with them and reviewed in our weekly meetings with ATK.

Q. Okay. But no formal notice in the form required in the contract was ever provided, was it?

A. To the best of my knowledge, no.

Q. Now, there is a third delay that you have talked about today and yesterday that isn't included in the claim, and that is a delay associated with the time it took to decide what to do with the AR concrete, correct?

A. That's correct.

Q. And was formal written notice ever provided of that delay?

. . . .

A. We didn't provide notice as we, you know, understood ATK was aware of the circumstances.

(Wallace Dep. 339-41.)

judgment with respect to its claim for delay damages resulting from the change to acid-resistant concrete, SNC argues it was not required to comply with the Contract's notice provisions, since the decision to use acid-resistant concrete was an "ATK-Directed Change." Alternatively, SNC contends that ATK had actual notice of the delays related to the decision to install acid-resistant concrete and, thus, that SNC was excused from providing written notice. For the following reasons, the court concludes that both arguments are without merit.

As stated above, the Contract between the parties is governed by Virginia law. Under Virginia law, the interpretation of a contract is a question of law. See Palmer & Palmer Co., LLC v. Waterfront Marine Constr., Inc., 662 S.E.2d 77, 80 (Va. 2008). "When a contract is clear and unambiguous, it is the court's duty to interpret the contract, as written." Id. In so doing, the court must "consider the contract as a whole and . . . not place emphasis on isolated terms." Quadros & Assocs., P.C. v. City of Hampton, 597 S.E.2d 90, 93 (Va. 2004).

A question of fact for resolution by the jury is raised only where the contract's terms are ambiguous. The issue of whether a contract is ambiguous is one of law. Pocahontas Mining LLC v. CNS Gas Co., 666 S.E.2d 527, 531 (Va. 2008). A contract is not ambiguous merely because the parties disagree about the meaning of the contract's terms. Id. Instead, "[a]n ambiguity exists when the contract's language is of doubtful import, is susceptible of being understood in more than one way or of having more than one meaning, or refers to two or more things at the same time." Id. "In determining whether disputed contractual terms are ambiguous, [the court must] consider the words employed by the parties in accordance with their usual, ordinary, and popular meaning"; [n]o word or phrase employed in a contract will be treated as meaningless if a reasonable meaning can be assigned to it." Id.

Applying these principles, the court concludes that SNC was required to provide written notice of the potential impact associated with the decision to install acid-resistant concrete, even if the decision was an "ATK-Directed Change," and that SNC has failed to establish that the applicable contract provisions are ambiguous in this regard. When considered in its entirety, § 12 of the Terms and Conditions sets out the procedures by which SNC was to receive compensation for changes in the Contract Price, and extensions of the Contract Time, resulting from a variety of conditions or circumstances. ATK-Directed Changes are the first category of changes discussed in § 12, and the first listed in the respective lists of events in §§ 12.2 and 12.3 that could justify an increase in Contract Price or Contract Time.

While SNC maintains that the Contract should be construed in such a manner that would require one to leap from § 12.1 to § 12.7 for ATK-Directed Changes, SNC provides no persuasive justification for its reading of the contract, and Virginia law prohibits such a selective interpretation. See Quadros & Assocs., P.C., 597 S.E.2d at 93 ("We consider the contract as a whole and do not place emphasis on isolated terms."). If, as SNC suggests, the Contract contemplated skipping over §§ 12.2 through 12.6 in the event of an ATK-Directed Change, then the provisions defining the bases for a change in Contract Price or Contract Time would not list ATK-Directed Changes.

Simply stated, SNC provides no valid basis for the position that §§ 12.1 and 12.7 apply to ATK-Directed Changes, but that §§ 12.2, 12.3, 12.4, 12.5, and 12.6 do not. As ATK emphasizes in its reply brief, §§ 12.1 and 12.7 are merely parts of the entire Changes procedure. Section 12.1 empowers ATK to direct changes to the work that are within the general scope of the Contract. It

13

does not speak to what happens after ATK initiates a change to the Contract. Instead, that is set out in the remainder of the Changes provisions.

Section 12.7, on the other hand, describes how the procedure for Changes ends. Either the parties agree to the change and ATK issues a change order memorializing the agreement, or the parties disagree and continue to the disputes procedure outlined in § 20. Section 12.7 is not an alternative change procedure. Instead, SNC cannot reach § 12.7 without first completing the steps in §§ 12.2 through 12.6. The court agrees with ATK that SNC's interpretation would force the court to ignore the plain language of §§ 12.2 and 12.3, or create an alternate Changes procedure that was not contemplated by the parties at the time the contract was executed. For these reasons, the court concludes, as a matter of law, that the written notice provisions apply to ATK-Directed Changes. See McDevitt & Street, 713 F. Supp. at 919 (rejecting the contractor's argument that formal written notice was unnecessary because the modifications at issue were made by the project owner's own architect).

Recognizing that there is no evidence that it provided formal written notice of any delays or delay damages associated with ATK's decision to install acid-resistant concrete, SNC emphasizes that ATK directed the changes and, thus, that it had "actual notice of first floor installation delays . . . and [the] means to determine their impact." (SNC Br. in Opp. to Summ. J. 31). This argument, however, is unpersuasive. The Contract, itself, includes no exception for actual notice, and SNC cites no Virginia case law to support the proposition that actual notice will excuse a contractor's failure to comply with a contract's written notice requirement. Indeed, when presented with a public construction case involving a statutory written notice requirement, the Virginia Supreme Court recently held that written notice was required and that actual notice

14

could not satisfy the statutory notice requirement. See Commonwealth v. AMEC Civil, LLC, 699 S.E.2d 499, 506 (Va. 2010).

Based on the foregoing, the court concludes that the Contract's written notice requirements apply to ATK-Directed Changes, and that SNC's failure to comply with the written notice requirements are fatal to its claim for delay damages resulting from the change to acid-resistant concrete. Accordingly, the court will grant ATK's motion for partial summary judgment with respect to this claim.

## II. Severe Winter Weather

ATK has also moved for summary judgment with respect to any damages related to the severe winter weather that Radford experienced, including the acceleration costs that SNC allegedly incurred as a result of ATK's refusal to extend the Contract Time. For the following reasons, the court concludes that genuine issues of material fact preclude the entry of summary judgment on the claim for acceleration costs associated with the denial of the requested extension, to the extent the request was based on severe winter weather. The motion for partial summary judgment will be granted with respect to other asserted weather-related damages.

As indicated above, the Contract permits time extensions for unusually severe winter weather. Section 12.2 states that a "change[] to the Contract Time may be permitted if [unusually severe weather] impact[s] the timely completion of the Work." (Terms and Conditions § 12.2.) Unlike that section of the Terms and Conditions, § 12.3, which governs changes to the Contract Price, expressly excludes severe weather or other acts of God from the list of events that provide a basis for changing the price of the Contract. Because severe weather is expressly omitted from § 12.3, and since SNC does not dispute the impact of this omission, the

court concludes that SNC is barred from recovering the costs that it incurred during the period of severe weather, including the costs of additional items that became necessary for SNC to perform as a result of the weather, and any costs associated with lost productivity during that time. See Pocahontas Mining LLC, 666 S.E.2d at 531 ("[T]he omission of a particular term from a contract is evidence that the parties intended to exclude that item."). Likewise, the court concludes that SNC is precluded from recovering damages resulting from weather-related delays. On the other hand, to the extent that SNC contends that ATK breached § 12.2 of the Contract by denying its weather-related request for extension of time, the court concludes that SNC is entitled to proceed to trial on its claim for acceleration costs resulting from the denied extension.

SNC's acceleration claim is premised on the theory of constructive acceleration. Such claim "ordinarily arises when the [owner] requires the contractor to adhere to the original performance deadline set forth in the contract, even though the contract provides the contractor with periods of excusable delay that entitle the contractor to a longer performance period." Murdock & Sons Constr., Inc. v. Goheen Gen. Constr., Inc., 461 F.3d 837, 840 (7th Cir. 2006) (emphasis in original) (internal citation omitted). Although different formulations have been used in setting forth the elements of constructive acceleration, the court concludes that in the context of this case, involving a contract between two private entities, the formulation set forth by the Seventh Circuit is most appropriate. Specifically, the court concludes that SNC must establish the following five elements in order to prevail on its constructive acceleration claim: (1) that SNC experienced an excusable delay entitling it to a time extension; (2) that SNC properly requested the extension; (3) that ATK failed or refused to grant the requested extension; (4) that ATK demanded that the project be completed by the original completion deadline despite the

16

excusable delay; and (5) that SNC actually accelerated the work in order to complete the project by the original completion date and incurred added costs as a result. Id.; see also Steven G.M. Stein, Construction Law P 6.12 (setting forth the foregoing "basic elements" of a constructive acceleration claim).

Applying these elements, the court finds that genuine issues of material fact preclude the entry of summary judgment on SNC's constructive acceleration claim, to the extent such claim is based on SNC's weather-related request for extension of time. It is undisputed that SNC notified ATK on February 25, 2010 that severe winter weather was impacting its performance, and that SNC formally requested a 30-day extension of time. It is also undisputed that ATK subsequently denied the request for extension of time and threatened to impose liquidated damages if the work was not completed by the date set forth in the Contract. Additionally, it is undisputed that SNC actually accelerated its performance following the denial of the requested extension. To the extent SNC suggests that the winter weather was not unusually severe enough to constitute an "excusable delay," or that SNC did "properly" request the extension of time, the court concludes that such issues must be decided by a jury.

In passing, the court notes that ATK cites two separate notice provisions contained in the Contract to support its argument that SNC's written request for an extension was improper. Having reviewed the provisions, the court concludes that, when considered together, the provisions are ambiguous. As previously discussed, § 12.5 purports to set forth the requirements for the notice to be used when the contractor becomes aware of a changed condition that may result in an increase in the Contract Time. This provision states that "[w]here possible, the Notice should provide a ROM . . . estimate of the cost of the change and a statement of whether

17

there is potential for delay to the project schedule." (Terms and Conditions § 12.5) (emphasis added). In its reply brief, ATK cites to another notice provision contained in § 7.5 of the Terms and Conditions. Unlike § 12.5, which requires an estimate of the cost of the change in time "where possible," § 7.5 states that a contractor "<u>shall</u> provide an estimate of the cost of bringing the Project back on schedule along with the recovery schedule." (Terms and Conditions § 7.5) (emphasis added). In light of the inconsistent language contained in these two provisions, the court finds that there is some ambiguity as to the extent of notice required to obtain an extension of time under the Contract, and that a jury must decide whether SNC properly requested an extension.

For these reasons, the motion for partial summary judgment will be denied to the extent that SNC seeks acceleration costs resulting from the denial of its weather-related request for extension of time.

### III. Unjust Enrichment

ATK has also moved for summary judgment with respect to SNC's claim for unjust enrichment. Because a written contract exists between ATK and SNC covering the same subject matter as the unjust enrichment claim, the court agrees with ATK that SNC cannot recover under its unjust enrichment theory. See, e.g., Lion Assocs., LLC v. Swiftships Shipbuilders, LLC, No. 1:10CV189, 2010 U.S. Dist. LEXIS 135095, at *2 (E.D. Va. Dec. 20, 2010) ("The Court grants Defendant's Motion for Summary Judgment on Plaintiff's unjust enrichment claim because, under Virginia law, quasi-contractual claims are prohibited where, as here, there is an express contract that governs the parties' relationship, rights, and responsibilities."); Commonwealth Group-Winchester Partners, L.P. v. Winchester Warehousing, Inc., No. 5:07CV00024, 2007 U.S.

18

Case 7:10-cv-00540-GEC   Document 54   Filed 10/13/11   Page 18 of 19   Pageid#: 1061

Dist. LEXIS 64652, at *24-26 (W.D. Va. Aug. 31, 2007) (discussing rationale for not allowing unjust enrichment claims where there is an express contract between the parties). Accordingly, the motion for partial summary judgment will be granted with respect to this claim.

## Conclusion

For the reasons stated, ATK's motion for partial summary judgment will be granted in part and denied in part. The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This 13th day of October, 2011.

/s/ Glen Conrad
Chief United States District Judge