CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

**MAY 0 3 2012**

JULIA C. DUDLEY, CLERK
BY: _____
      DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| SNC-LAVALIN AMERICA, INC., | ) | |
| | ) | |
| Plaintiff/ Counter-Defendant, | ) | Civil Action No. 7:10CV00540 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| ALLIANT TECHSYSTEMS, INC., | ) | By: Hon. Glen E. Conrad |
| | ) | Chief United States District Judge |
| Defendant/ Counter-Plaintiff. | ) | |

This case is presently before the court on the renewed motions for judgment as a matter of law filed by SNC-Lavalin America, Inc. ("SNC") and Alliant Techsystems, Inc. ("ATK"). For the reasons set forth below, SNC's motion will be granted in part and denied in part, and ATK's motion will be denied.

### Background

This diversity action stems from the design and construction of a new nitric acid and sulfuric acid concentration plant ("NAC/SAC") at the Radford, Virginia arsenal owned by the United States Army and operated by ATK. ATK and SNC entered into a multi-million dollar design-build contract ("the Contract"), pursuant to which SNC agreed to provide engineering, procurement, and construction services.

SNC began its work on October 2, 2008. Pursuant to the Contract, SNC had 642 days to complete the work required under the Contract, in the absence of any time extensions. Unfortunately, the path to completion was wrought with delays, disputes, and alleged plan alterations. In the end, SNC did not meet the deadline set forth in the Contract, and the parties dispute where to place the blame for the delays.

On December 6, 2010, SNC filed the instant action, seeking reimbursement for extra work that it was allegedly required to perform; delay damages resulting from ATK's decision to use acid-resistant concrete on the first floor of the NAC/SAC; additional costs incurred as a result of unusually severe winter weather; and acceleration costs incurred as a result of the denial of SNC's weather-related request for extension of time. ATK then filed counterclaims against SNC, seeking damages for the delay in the project's completion and for incomplete and/or inadequate work.

On September 7, 2011, ATK moved for partial summary judgment with respect to certain categories of damages identified by SNC. The categories included delay damages resulting from the change to acid-resistant concrete; additional costs incurred as a result of the severe winter weather; and acceleration costs. On October 13, 2011, ATK's motion was granted in part and denied in part. SNC-Lavalin America, Inc. v. Alliant Techsystems, Inc., Case No. 7:10CV00540, 2011 U.S. Dist. LEXIS 118312, at *28 (W.D. Va. Oct. 13, 2011). Based on its review of the terms of the parties' Contract,[1] the court held that ATK was entitled to summary judgment with respect to SNC's claim for delay damages resulting from the change to acid-resistant concrete. Id. at *21. Likewise, the court held that SNC was barred from recovering certain costs that were incurred during the period of unusually severe winter weather, such as the costs of additional items that became necessary for SNC to perform as a result of the weather conditions. Id. at *23. On the other hand, the court concluded that SNC was entitled to proceed to trial on its claim for acceleration costs resulting from the denial of its weather-related request for extension of time. Id. at *23-24.

---

[1] It is undisputed that the Contract is governed by Virginia law.

2

A jury trial commenced on October 17, 2011 and spanned thirteen days. The court bifurcated the case into liability and damages phases. In the liability phase, the jury found in favor of SNC on its acceleration claim. The jury also found in favor of ATK on its related claim that SNC breached the contract by failing to complete the project on time, finding that ATK was entitled to recover liquidated damages for 30 days of delay. Additionally, the jury found in favor of ATK on several deficiency claims, including its counterclaims related to the mass notification system, chiller, steam skid, Richter pump, and control valves.

Before the jury reached a verdict on liability, the parties entered into a written agreement pursuant to which they stipulated to the amount of damages associated with certain claims, including ATK's deficiency claims. Accordingly, during the damages phase, the jury was only tasked with determining the amount of damages for which SNC was entitled to recover on its acceleration claim. On November 3, 2011, the jury awarded SNC damages in the amount of $332,800.00. That same day, the court entered a judgment implementing the jury's verdicts and the parties' written agreement on damages.[2]

Both parties subsequently filed motions for judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure. The court held a hearing on the motions on January 11, 2012. During the hearing, the parties were granted the opportunity to file supplemental briefs. The motions have now been fully briefed and are ripe for review.

---

[2] The judgment was later amended to include ATK's steel index credit claim. At the conclusion of the parties' evidence, the court granted ATK's unopposed motion for judgment as a matter of law with respect to that claim.

3

## Standard of Review

Rule 50(b) of the Federal Rules of Civil Procedure permits the parties to file renewed motions for judgment as a matter of law following the jury's verdict and the entry of judgment. The court must grant a Rule 50(b) motion if there is no legally sufficient evidentiary basis for a reasonable jury to find for the prevailing party on a particular issue. Fed. R. Civ. P. 50(a)(1). In ruling on the motion, the court must view the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party, Lack v. Wal-Mart Stores, Inc., 240 F.3d 255, 259 (4th Cir. 2001), and may not substitute its judgment for that of the jury or make credibility determinations, Price v. City of Charlotte, 93 F.3d 1241, 1249 (4th Cir. 1996). The verdict must be upheld if there is evidence upon which a reasonable jury could return a verdict in favor of the nonmoving party. Price, 93 F.3d at 1249-50.

## Discussion

### I.      SNC's Rule 50(b) Motion

SNC has renewed its motion for judgment as a matter of law with respect to ATK's mass notification, Richter pump, control valves, and chiller claims. The court will address each of these claims in turn.

#### A.      Mass Notification

ATK's mass notification claim is one for breach of contract. Specifically, ATK claims that SNC breached the parties' Contract by failing to provide a fire alarm system that provides for mass notification.

To support this claim at trial, ATK presented a copy of a report prepared by William N. Brooks, a professional engineer retained by SNC to perform a fire protection design analysis.

4

The analysis was required by Unified Facilities Criteria[3] ("UFC") 3-600-01 and the Engineering

Functional Specifications ("EFS") incorporated into the parties' Contract.   In the fire protection

report, which was prepared in August of 2009, Brooks indicated that the "building fire alarm

system" installed at the NAC/SAC "will be a voice type system with mass notification

capability," and that "[s]peakers will be installed on the interior and exterior of the building."

(Def's Trial Ex. 90 at 16.)  Hank Froese, SNC's project manager, was questioned on cross-

examination by ATK's counsel regarding the fire protection report.  When asked if Brooks

thought that a mass notification system was required, Froese responded in the affirmative.

(10/31/2011 Trial Tr. at 95.)  During closing argument, ATK's counsel argued that the fire

protection report "is clear as day," and that "[m]ass notification is required according to the guy

that SNC hired to be their expert." (Id. at 247.)

For its part, SNC presented testimony indicating that a mass notification system was not

required by the parties' Contract.  Robert Marzetti, a professional engineer employed by SNC,

testified that he reviewed the EFS and the applicable codes cited in the EFS, including UFC

3-600-01, and that the codes did not require the installation of a mass notification system at the

NAC/SAC.  (10/24/2011 Trial Tr. at 105-106.)  Marzetti testified that the codes require new

"inhabited" federal buildings to have a mass notification system, and that the NAC/SAC does not

constitute an "inhabited" building for purposes of the applicable codes,  since it does not have a

normal occupancy of 11 people.  (Id.)  During closing argument, SNC's counsel focused on the

testimony elicited from Marzetti, emphasizing that "you have got to have 11 people in order to be

---

[3] The Unified Facilities Criteria system provides planning, design, construction, sustainment, restoration, and modernization criteria applicable to all Department of Defense projects.

responsible to put in a mass notification system." (10/31/2011 Trial Tr. at 193.)  SNC's counsel

noted that although ATK had initially considered following the maintenance approach utilized by

a similar plant in Germany, which employed at least ten workers responsible for cleaning and

maintaining the acid production areas, ATK later decided to rely on preventative measures to

manage corrosion and extend the long-term performance of the plant, which necessitated a much

smaller number of employees.  (Id. at 193-194.)  Referencing testimony from Jared Hendrick,

ATK's lead project engineer, SNC's counsel emphasized that ATK "just had two working [at the

NAC/SAC]," and that "[t]hat's not mass."  (Id. at 194.)

The jury ultimately found in favor of ATK on its mass notification claim.  In accordance

with the jury's verdict on liability and the parties' written agreement on damages, the court

entered judgment in favor of ATK in the amount of $299,639.42.

In its renewed motion under Rule 50(b), SNC argues that this breach of contract claim

fails as a matter of law, because none of the applicable code provisions cited in the EFS, and

incorporated into the parties' Contract, required SNC to install a mass notification system.

During the hearing on the instant motions, ATK agreed that "the EFS is the law of the land," for

purposes of the work required under the Contract.  (1/11/2012 Tr. at 12.)  ATK disagreed,

however, with SNC's argument that neither the EFS nor the applicable code provisions required

a mass notification system.  The court ultimately permitted both sides to file supplemental briefs

addressing this particular claim.  Additionally, the court afforded the parties the opportunity to

submit any additional code provisions necessary for a full understanding of the codes and

standards pertinent to the issue of mass notification.

6

Having reviewed the record, including the applicable contractual and code provisions cited by the parties, the court concludes, as a matter of law, that SNC was not required to install a mass notification system. Accordingly, for the reasons set forth below, the court will grant SNC's renewed motion with respect to this claim.

### 1.  The work required under the Contract was based on the EFS.

Pursuant to the Contract, SNC agreed to perform "all Work required to complete the design, construction, start-up and testing of the NAC/SAC facility . . . ." (Contract § 3.1.) The Contract defined "Work" as "any and all of the services necessary for Contractor to complete the design and construction of the facility represented in its 30% Design and to carry out the intent of the Contract." (Contract § 1.1(l).) The Contract further provided that "[t]he '30% Design' shall be the basis of the Work under the Design/Build Option for the NAC/SAC facility." (Contract § 1.1(m).) It is undisputed that SNC's 30% Design was based on the requirements contained in the Engineering Functional Specifications ("EFS") provided by ATK. The parties introduced the EFS into evidence at trial.

The criteria and requirements for the NAC/SAC's fire protection system were set forth in Section 6.4 of Volume 2 of the EFS. Pursuant to § 6.4.1.2, the design of the fire protection system was required to conform to a number of codes, standards, and specifications, including UFC 3-600-01 ("Design Fire Protection Engineering for Facilities, September 26, 2006") and National Fire Protection Association ("NFPA") 101 ("Life Safety Code 2006 Edition"). To the extent any discrepancies or conflicts existed between the EFS and the applicable codes, the parties were directed to refer such issues to the Supervising Fire Protection Engineer for resolution. (EFS § 6.4.1.2.)

7

2.     **The sections of the UFC referenced in the EFS do not require the installation of a mass notification system.**

The United States Department of Defense has defined the term "mass notification" as the capability to provide "real-time information and instructions to people in a building, area, site, or installation using intelligible voice communications along with visible signals, text, and graphics, and possibly including tactile or other communication methods." (UFC 4-021-01 at § 1-1.) "The purpose of mass notification is to protect life by indicating the existence of an emergency situation and instructing people of the necessary and appropriate response and action." (Id.)

UFC 3-600-01, cited in the EFS, sets forth the fire protection engineering requirements applicable to all new and existing Department of Defense facilities, including the NAC/SAC. As SNC emphasizes, UFC 3-600-01 does not require the installation of a mass notification system. Instead, § 5-3.2 of UFC 3-600-01, which sets forth the requirements of fire alarm evacuation systems, provides as follows:

> Fire alarm systems must be independent, stand-alone systems that are not an integral part of a security, an energy monitoring and control system (EMCS), or other system, except that a fire alarm system may be combined with a building mass notification system or with a combination building mass notification and public address system.

(UFC 3-600-01 at § 5-3.2) (emphasis added). For additional information on mass notification systems, § 5-3.3 of UFC 3-600-01 refers the reader to UFC 4-021-01.

UFC 4-021-01, titled "Design and O&M: Mass Notification Systems," also does not require the installation of a mass notification system at the NAC/SAC. Instead, it provides the design criteria for facilities that are required to have a mass notification system. UFC 4-021-01 refers the reader to another UFC document to determine whether a mass notification system is, in

fact, necessary.  Section 1-2 of UFC 4-021-01 states that "[t]his UFC provides technical criteria

for systems that will . . . implement mass notification in compliance with DOD antiterrorism

requirements as specified in UFC 4-010-01."  (UFC 4-021-01 at § 1-2.)  Likewise, § 1-3 states

that "[t]he requirement for a MNS is established by UFC 04-010-01.  This document is intended

to assist in the design of systems that meet the requirement established by UFC 04-010-01 and to

give guidance to commanders, architects, engineers, and end users on design, operation, and

maintenance of [mass notification systems]."  (UFC 4-021-01 at § 1-3.)

For its part, UFC 4-010-01, titled "DoD Minimum Antiterrorism Standards for

Buildings," contains minimum antiterrorism requirements that apply to certain structures,

including "all DOD inhabited buildings."  (UFC 4-010-01 at § 1-6.)[4]  "The intent of these

standards is to minimize the possibility of mass casualties in buildings or portions of buildings

owned, leased, privatized, or otherwise occupied, managed, or controlled by or for DoD

[Department of Defense]."  (Id. at § 1-4) (emphasis added).  Standard 22, titled "Mass

Notification," provides that "[a]ll new inhabited buildings must have a capability to provide real-

time information to building occupants or personnel in the immediate vicinity of the building

during emergency situations . . . . Refer to UFC 4-021-01 for further guidance."  (Id. at § B-4.7.1)

(emphasis added).  The term "inhabited buildings" is defined as "[b]uildings or portions of

buildings routinely occupied by 11 or more DoD personnel and with a population density of

greater than one person per 40 gross square meters (430 gross square feet)."  (Id. at Appendix A.)

---

[4] The applicable version of UFC 4-010-01 can be viewed in its entirety at the following Internet address: http://www.gsa.gov/graphics/pbs/Standards_DoD_Minimum_Antiterrorism_Standards_for_Buildings.pdf.

The term "DoD personnel" includes "[a]ny U.S. military, DoD civilian, or family member thereof, host-nation employees working for DoD, or contractors occupying DoD buildings." (Id.) In this case, as SNC emphasizes, there was no evidence presented at trial which would indicate that the NAC/SAC is routinely occupied by 11 or more Department of Defense personnel, as defined by UFC 4-010-01. Instead, the evidence established that the NAC/SAC is normally occupied by only two individuals – one ATK employee who works in the control room and one that maintains the plaint. (10/28/2011 Trial Tr. at 36-37.)

According to the evidence adduced at trial, ATK originally considered employing the European method for preventing corrosion at the NAC/SAC, which would have involved a rigorous maintenance program and more than ten maintenance employees. A few months after the parties entered into the Contract, representatives from ATK and SNC toured a similar plant in Germany, and learned more about the maintenance model utilized at that facility, which had upwards of ten or more maintenance personnel on duty. At some point thereafter, at a time corresponding to ATK's decision to change to a more acid-resistant flooring, ATK decided to instead rely on preventative maintenance measures that necessitated a much smaller number of employees. While the evidence did not definitely establish when SNC first decided to abandon its plans to employ a large maintenance crew, it is undisputed that ATK ultimately chose to staff the NAC/SAC with only a few employees, and that the NAC/SAC is not routinely operated by 11 or more Department of Defense personnel, as defined by UFC 4-010-01.

Consequently, the court is convinced that a mass notification system was only required by the applicable UFC provisions if the NAC/SAC had been staffed by a larger number of employees. Because there is no evidence that the NAC/SAC is routinely occupied by eleven or

more personnel, the court agrees with SNC that the UFC provisions referenced in the EFS do not require the installation of a mass notification system.

### 3. NFPA 101 requires a system that provides voice notification, not mass notification.

Although mass notification is expressly defined and addressed in the UFC system of codes, ATK argues for the first time in its supplemental brief that "NFPA 101 is the source of the mass notification requirement." (ATK Supp'l Br. at 7.) ATK cites § 11.8 of NFPA 101, which requires high-rise buildings to include a "fire alarm system using an approved, emergency voice/alarm communication system . . . installed in accordance with Section 9.6." (NFPA 101 at § 11.8.) ATK also cites § 6.10 of the fire protection report prepared by Brooks, which confirms that "NFPA 101 requires a fire alarm system with voice communication capability." (Def.'s Trial Ex. 90 at § 6.10.)

As SNC emphasizes, however, a mass notification system has unique features defined by the Department of Defense, and is not the same thing as the "voice/alarm communication system" described in NFPA 101. As set forth above, the capabilities of a mass notification system are set forth in UFC 4-021-01, which provides as follows:

> **CAPABILITY**. Mass notification provides real-time information and instructions to people in a building, area, site, or DOD using intelligible voice communications, <u>along with visible signals, text, and graphics, and possibly including tactile or other communication methods</u>. MNS are intended to protect life by indicating the existence of an emergency situation and instructing people of the necessary and appropriate response and action.

UFC 4-21-01, § 2-2 (emphasis added).[5]

---

[5] UFC 4-021-01 can be viewed in its entirety at the following Internet address: http://www.wbdg.org/ccb/DOD/UFC/ufc_4_021_01.pdf.

The fire protection report relied upon by ATK also recognizes that mass notification is distinct from the requirements described in NFPA 101.  Section 6.10 of the report states that "NFPA 101 requires a fire alarm system with voice communication capability." (Def.'s Trial Ex. 90 at § 6.10.)  While the report goes on to state that a "voice type fire alarm, combined with mass notification, will be installed," the report does not state that mass notification is required by NFPA 101 or any other applicable code provision.  (Id.) (emphasis added).

### 4.     SNC's remaining arguments regarding the meaning and effect of the fire protection report are unpersuasive.

The remainder of ATK's supplemental brief is devoted to arguments regarding the effect of Brooks' fire protection report and considerations Brooks might have made in the course of preparing the report.  For the following reasons, the court finds these arguments unpersuasive.

First, to the extent ATK refers to Brooks as an "expert" and attempts to proffer his professional analysis as an expert opinion on the issue of whether mass notification was required (ATK Supp'l Br. at 4), ATK's efforts are contrary to well-established evidentiary rules.  Brooks was never identified as a witness, and he did not testify at trial or give a deposition in this matter. Consequently, ATK cannot rely on his report as offering an expert opinion on the issue of mass notification.  See, e.g., Tokio Marine & Fire Ins. Co. v. Norfolk & W. Ry., Case No. 98-1050, 1999 U.S. App. LEXIS 476, at *10 (4th Cir. Jan. 14, 1999) ("Reports stating an expert opinion 'are not admissible without the preparer being present in court to testify as to his qualifications as an expert and to be cross-examined on the substance.'") (quoting Forward Communications Corp. v. United States, 608 F.2d 485, 511 (Ct. Cl. 1979)).

In any event, the relevant portions of the fire protection report are self-limiting.  As set forth above, the report does not specifically state that a mass notification system is required by the applicable codes.  Instead, in the section labeled "Building Code Analysis," which was performed pursuant to § 6.4.2.3 of the EFS and UFC 3-600-01, the report states that "NFPA 101 requires a fire alarm system with voice communication capability," and that "[a] voice type fire alarm, combined with mass notification, will be installed."  (Def.'s Trial Ex. 90 at § 6-10.) (emphasis added).  Thus, as required by the EFS and the UFC, the report distinguishes between what is required under the applicable codes, and what it proposes that SNC provide.  See EFS § 6.4.2.3 ("Where applicable, discuss the following minimum fire protection provisions (include required vs. provided) (emphasis added); UFC 3-600-01, § 1-4 (same).

For its final argument, ATK contends that "it was the Fire Code Report itself that set the requirements for the Project," and that SNC was "contractually obligated to . . . install a fire protection system complying with that analysis."  (ATK Supp'l Reply Br. at 9.)  The court agrees with SNC, however, that this argument is also unavailing.  As set forth above, the EFS clearly provided that the fire protection design was required to conform to the requirements of the codes, standards, and specifications listed in § 6.4.1.2 of the EFS.  While one of the listed codes, UFC 3-600-01, and, in turn, the EFS, required SNC to retain an engineer to perform a fire protection design analysis, the EFS does not state that SNC will be contractually bound to perform all of the work recommended in the report, including work which might fall outside the scope of the actual code requirements.  Indeed, the report itself emphasizes that it "is not intended to be a comprehensive review of all applicable code requirements, nor is it a detailed review of all

13

design documentation." (Def.'s Trial Ex. 90 at § 1.0.) Instead, the report indicates that it is intended "to be utilized as a design guide for the various engineering disciplines in the completion of the project design documents, and to bring attention to any potential code issues to Authorities Having Jurisdiction." (Id.) Accordingly, in the absence of any applicable code requirement, the court agrees with SNC that the mere fact that the report proposed the installation of a mass notification system did not create a binding contractual obligation.

      For the reasons stated, the court concludes that ATK has failed to establish that SNC was mandated, by contract, to install a mass notification system at the NAC/SAC plant. Under the applicable code provisions cited in the EFS, a mass notification system was required only if the plant had been routinely staffed by eleven or more personnel. Because the evidence at trial revealed that the NAC/SAC is normally occupied by only two individuals, the court concludes, as a matter of law, that a mass notification system was not required under the parties' Contract. Accordingly, SNC is entitled to judgment on ATK's claim for breach of contract pertaining to the mass notification system, and SNC's renewed motion will be granted with respect to this claim.

### B.   Richter Pump and Control Valves

      In its next set of counterclaims, ATK asserted that the Richter pump and control valves installed by SNC did not function properly and, thus, that SNC's work with respect to these items constituted both a breach of contract and a breach of express warranty. The jury was instructed that ATK was entitled to recover on these claims if it found that ATK established the essential elements of either cause of action.

## 1.    **Breach of Contract**

To the extent ATK sought to recover for breach of contract based on the non-functioning

Richter pump and control valves, such claim was brought pursuant to § 9.4 of the parties'

Contract.  Section 9.4, titled "Defective work," provides as follows:

> In case any Work is defective in any manner, or otherwise not in strict
> conformance with the requirements of the Contract or applicable laws and
> regulations, ATK shall have the right either to reject it, require its
> correction, or accept it with an equitable adjustment in the Contract Price
> or other consideration.  ATK's acceptance of nonconforming Work does
> not release Contractor from its warranty or latent defect obligations.  Any
> Work that has been rejected or requires correction shall be replaced or
> corrected by, and at the expense of the Contractor.  If, after notice by
> ATK, Contractor fails to promptly replace or correct any defective Work,
> ATK may: (I) replace or correct such Work and charge to Contractor the
> cost incurred by ATK in doing so; (ii) terminate the Contract in
> accordance with . . . the Termination for Default provision; and (iii)
> require a reduction in price that is equitable under the circumstances.
> ATK may exercise any or all of the foregoing options and such exercise
> shall not preclude the exercise of any other rights under this Contract.

(Contract § 9.4.)

In seeking judgment as a matter of law with respect to the breach of contract claims, SNC

argues that ATK failed to comply with the notice requirement set forth in § 9.4.  This particular

argument, as ATK emphasizes in its reply brief, was not raised during trial.  Even if it was

properly preserved, however, the court agrees with ATK that the argument is without merit.

On direct examination, Robert Marzetti, SNC's project engineering manager, testified

that he was responsible for overseeing the project's "punch list," which identified items which

were incomplete or required further work before the completion of the project.  (10/24/2011 Trial

Tr. at 96.)  Such items included both the Richter pump and the control valves.  Marzetti

acknowledged that ATK notified SNC about defective pumps during the punch list process, and

15

that SNC investigated the issue with the pump manufacturer.  (<u>Id.</u> at 106-07.)  Likewise,

Marzetti testified that he investigated ATK's complaint regarding the control valves, and that he

was aware that ATK had returned the valves to the manufacturer for inspection.  (<u>Id.</u> at 108.)

Additionally, Jared Hendrick, ATK's project manager, testified that ATK and SNC discussed

problems with the Richter pump and control valves before the completion of the NAC/SAC

commissioning.  (10/28/2011 Trial Tr. at 39-40.)

      Although § 9.4 of the Contract requires ATK to notify SNC regarding any defective

work, the provision does not require any particular form of notice.  Based on the testimony

summarized above, the record demonstrates that ATK notified SNC of the problems associated

with both the Richter pump and the control valves.  In the absence of any requirement as to a

specific type of notice, the court is convinced that the parties' discussions and subsequent

investigations satisfy the notice provision of § 9.4, and that SNC's motion must be denied with

respect to this argument.

2.    <u><b>Breach of Warranty</b></u>

      In addition to seeking recovery under a breach of contract theory, ATK also sought to

recover the costs of repairing and/or replacing the Richter pump and control valves under a

breach of warranty theory.  The breach of warranty claim is based on § 15.1 of the parties'

Contract, pursuant to which SNC expressly warranted that its work "will be complete, accurate,

free from defects, errors or omissions in equipment, material, construction or design furnished,

and in compliance with the requirements of the Contract."  (Contract § 15.1.)

      In moving for judgment as a matter of law with respect to the breach of warranty claims,

SNC argues that the claims fail because ATK did not offer expert testimony to prove the

16

existence of a product defect.  For the following reasons, the court concludes that this argument is without merit.

The majority of Virginia cases cited by SNC are products liability actions in which plaintiffs sought to recover damages for personal injuries resulting from allegedly defective products.  See, e.g., Garrett v. I.R. Witzer Co., Inc., 518 S.E.2d 635 (Va. 1999); Jeld-Wen, Inc. v. Gamble, 501 S.E.2d 393 (Va. 1998);  Logan v. Montgomery Ward & Co., 219 S.E.2d 685 (Va. 1975); Brown v. Hobart Corp., 57 Va. Cir. 269 (Va. Cir. 2002).  To prevail in a products liability action under Virginia law, whether the case is premised on a warranty theory or a negligence theory, a plaintiff must show (1) that the product contained a defect that rendered it unreasonably dangerous for ordinary or foreseeable use; (2) that the defect existed when the product left the defendant's hands; and (3) that the defect actually caused the plaintiff's injury.  Logan, 219 S.E.2d at 687; see also Alevromagiros v. Hechinger Co., 993 F.2d 417, 420 (4th Cir. 1993).  In such cases, "[e]xpert testimony is usually necessary . . . to establish defectiveness or dangerousness of the product, [and] causation."  Charles E. Friend, Personal Injury Law in Virginia § 19.3 (3d ed. 2003); see also Wright v. Eli Lilly & Co., 66 Va. Cir. 195, 222 (Va. Cir. 2004).

The instant case, of course, is not a products liability action.  It is a commercial construction case, in which SNC expressly warranted that its work would be "complete, accurate, free from defects, errors or omissions in equipment, material, construction or design furnished, and in compliance with the requirements of the contract."  (Contract § 15.1.)  Courts have recognized that commercial cases involving an alleged violation of an express warranty are distinguishable from products liability cases, and that they are not necessarily subject to the same

evidentiary requirements. See, e.g., RMA Lumber, Inc. v. Pioneer Mach., LLC, Case. No. 6:08-cv-00023, 2009 U.S. Dist. LEXIS 108346, at *22 n.6 (W.D. Va. Nov. 19, 2009) (declining to take the position that expert testimony is required to establish a breach of express warranty contained in a commercial contract). In this case, the court agrees with ATK that a layperson could determine whether or not the Richter pump and control valves installed by SNC satisfied the express warranty provision, and that no expert testimony was required.

Additionally, the court agrees with ATK that the lay testimony presented by ATK was sufficient to establish its breach of warranty claims. Jared Hendrick testified that the control valves have not functioned properly and he described the malfunctions. Likewise, Hendrick testified regarding the "numerous failures of the Richter pumps." (10/27/2011 Trial Tr. at 175; 10/28/2011 Trial Tr. at 42.) In light of such testimony, a jury could reasonably find that SNC's work with respect to the valves and pumps was not "free from defects, errors or omissions in equipment, material, construction, or design furnished," as required by the express warranty provision in the Contract. Accordingly, SNC's renewed motion will be denied with respect to these claims.

### C.   Chiller

SNC also seeks judgment as a matter of law with respect to ATK's counterclaim for breach of contract pertaining to the chiller. At trial, ATK established that SNC's chiller installation violated the National Electrical Code ("NEC") and, thus, the parties' Contract. SNC nonetheless argues that ATK is not entitled to prevail on its breach of contract claim, since ATK failed to mitigate its damages. SNC emphasizes that ATK could have requested a variance for

18

the NEC violation, which, if granted, would have prevented ATK from incurring the costs required to remedy the installation defect.

To prevail on a claim for breach of contract under Virginia law, a plaintiff must establish three elements: "(1) a legally enforceable obligation of the defendant to the plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." Sunrise Continuing Care, LLC v. Wright, 671 S.E.2d 132, 135 (Va. 2009) (internal citation and quotation marks omitted). In this case, it is undisputed that ATK satisfied each of these elements at trial. SNC did not deny that its installation of the chiller violated the NEC and the Contract. Indeed, Robert Marzetti admitted to the violation on direct examination. In addition, Jared Hendrick testified that the Contract required compliance with the NEC and that the current installation of the chiller violates the NEC. Hendrick also described the actions that must be taken in order rectify the violation. Based on the testimony of Marzetti and Hendrick, the court is convinced that the jury had sufficient evidence to find SNC liable on ATK's chiller claim.

While SNC argues that ATK could have mitigated its damages, this argument provides no basis to disrupt the jury's finding in favor of ATK during the liability phase. As ATK emphasizes in its brief in opposition, the mitigation of damages is not an element of a breach of contract claim under Virginia law, but an affirmative defense that "the party that breached the contract bears the burden of proving . . . by a preponderance of the evidence." Johnson v. Washington, Case No. 2:07cv204, 2008 U.S. Dist. LEXIS 24082, at *14 (E.D. Va. Mar. 12, 2008) (citing Fox-Sadler v. Norris Roofing Co., 327 S.E.2d 95 (Va. 1985)). In addition, "[u]nlike most affirmative defenses, mitigation of damages is not a defense that, if proven,

19

constitutes an absolute bar to the plaintiff's claim." Monahan v. Obici Med. Mgmt. Servs., Inc.,

628 S.E.2d 330, 337 (Va. 2006). Instead, it is a defense that may reduce the amount of damages

a plaintiff is entitled to recover after liability has been found. Id.; see also Bitler Investment

Venture II, LLC v. Marathon Ashland Petroleum, LLC, Case No. 1:04-CV-477-TLS, 2011 U.S.

Dist. LEXIS 146663, at *79 (N.D. Ind. Dec. 20, 2011) ("The Defendants offer a brief,

undeveloped argument that the Plaintiffs have failed to mitigate damages, and the Plaintiffs' . . .

claims should therefore fail. To be sure, there is a duty to mitigate damages if a plaintiff wishes

to recover on a contract. But as the Plaintiffs argue, the duty to mitigate is an affirmative defense

to reduce the amount of damages a defendant must pay, not a defense to liability . . . . If the

Defendants are found liable to the Plaintiffs for damages, then evidence of the Plaintiffs' alleged

failure to mitigate will be relevant."); Johnson, 2008 U.S. Dist. LEXIS 24082 at *12-13 (granting

summary judgment in favor of the defendant on its counterclaim for breach of contract, and then

proceeding to consider the plaintiff's mitigation defense in determining the amount of damages

to which the defendant was entitled).

  In this case, consistent with the foregoing case law, the court declined to give the jury a

mitigation instruction during the liability phase of trial. The court noted that such instruction, if

necessary, would be given during the damages phase of the case. See 10/31/2011 Trial Tr. at 23

("To the extent that there's a necessity for a mitigation instruction, I will give it as part of the

damage phase of the case."); Id. at 134 ("So I'm going to send [the chiller] claim to the jury as

well, though with the understanding that if a verdict is returned in favor of ATK on that claim,

that you will be entitled to a mitigation instruction, [and] have the special verdict form instructed

accordingly."). Rather than having the jury decide the measure of damages associated with the

chiller claim, SNC ultimately agreed, prior to receiving the jury's verdict on liability, to stipulate to the amount of damages that ATK would be entitled to recover on its chiller claim if ATK prevailed during the liability phase.  Consequently, the parties did not present evidence during the damages phase regarding the chiller or SNC's mitigation defense, and the jury was not asked to determine the amount of damages that ATK was entitled to recover to remedy the installation defect.

Under these circumstances, the court is convinced that SNC's motion must be denied with respect to this claim.  Since the mitigation of damages is not an affirmative defense to liability, and since neither the chiller claim nor the mitigation defense was presented during the damages phase, SNC is not entitled to judgment as a matter of law on the basis of this defense.  See Babcock v. BellSouth Adver. & Pub'g Corp., 348 F.3d 73, 76 (4th Cir. 2003) ("Judgment as a matter of law is appropriate only when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'") (quoting Fed. R. Civ. P. 50(a)(1)).  Accordingly, SNC's renewed motion will also be denied with respect to ATK's chiller claim.

## II.     ATK's Rule 50(b) Motion

For its part, ATK has moved for judgment as a matter of law on SNC's acceleration claim, through which SNC sought to recover costs that arose when ATK refused to grant an extension of time for weather-related delays and required SNC to adhere to the original deadline set forth in the Contract.  The jury found in favor of SNC on this claim and awarded damages in the amount of $332,800.00.  In seeking judgment as a matter of law, ATK argues that SNC was required to provide "post-denial notice of a constructive order to accelerate," and that ATK failed to fulfill this requirement.  (ATK Br. in Supp. of Mot. at 1.)  ATK also argues that the evidence

21

was insufficient for a reasonable jury to find that SNC properly requested a time extension or that

ATK unreasonably failed or refused to grant the requested extension. For the reasons that

follow, the court finds each of ATK's arguments unpersuasive.

### A.      The Elements of Constructive Acceleration

Acceleration claims fall into two general categories: claims for actual acceleration, which

arise when a contractor has been expressly ordered to pick up the pace of work; and claims for

constructive acceleration, which arise, as in this case, "when a contractor has a justified claim for

an extension of time, but is required to incur additional expenses because the project owner

refuses to grant the extension and requires the contractor to complete the project by the original

completion date." Sherman R. Smoot Co. v. State of Ohio, 736 N.E.2d 69, 78 (Ohio Ct. App.

2000); see also Envirotech Corp. v. Tennessee Valley Auth., 715 F. Supp. 190, 192 (W.D. Ky.

1988) ("The basis for recovering for constructive acceleration is that the contractor encountered

an excusable delay but the contracting officer would not grant a time extension to recover the lost

time.").

The parties have not cited to any case law from the United States Court of Appeals for the

Fourth Circuit or the Virginia Supreme Court recognizing or applying a constructive acceleration

claim. Nonetheless, constructive acceleration "is recognized in many jurisdictions," Murdock &

Sons Constr., Inc. v. Goheen General Constr., Inc., 461 F.3d 837, 841 (7th Cir. 2006), and the

parties do not dispute that such a claim is viable under Virginia law.[6]

---

[6] According to the parties, the only decision by a federal court in Virginia involving a claim of
constructive acceleration is McDevitt & Street Co. v. Marriott Corp., 713 F. Supp. 906 (E.D. Va. 1989).
In its brief discussion of this claim, the McDevitt Court stated that "a contractor may only recover for the
increased costs of acceleration if it can establish three predicates: '(1) that any delays giving rise to the
order were excusable, (2) that the contractor was ordered to accelerate, and (3) that the contractor in fact
accelerated performance and incurred extra costs.'" Id. at 915 (quoting Norair Eng'g Corp. v. United
States, 666 F.2d 546, 548 (Ct. Cl. 1981)). The Court ultimately held the contractor's acceleration claim
failed because the contractor did not encounter any excusable delays. Id.

The majority of cases involving claims for constructive acceleration have been litigated in the federal agency appeals boards and the United States Court of Federal Claims, and have involved construction or procurement contracts with the federal government. See Steven G.M. Stein, Construction Law, P 6.12 (LexisNexis 2012); Barry B. Bramble & Michael T. Callahan, Construction Delay Claims, § 6.05 (Westlaw 2012). The theory has also been utilized, however, in cases involving claims against private contractors, as well as state and local government entities. See, e.g., Murdock & Sons Constr., Inc., 461 F.3d at 838; McDevitt & Street Co. v. Marriott Corp., 713 F. Supp. 906, 915 (E.D. Va. 1989); Envirotech, 715 F. Supp. at 191; Sherman R. Smoot Co., 736 N.E.2d at 72; Fru-Con Corp. v. State of Illinois, 50 Ill. Ct. Cl. 50, 51 (Ill. Ct. Cl. 1996); Dep't of Transp. v. Anjo Constr. Co., 666 A.2d 753, 756 (Pa. Commw. Ct. 1995).

In ruling on ATK's motion for summary judgment with respect to this claim, the court recognized that different formulations have been used in setting forth the requisite elements of constructive acceleration. The court ultimately adopted the standard set forth by the United States Court of Appeals for the Seventh Circuit in Murdock & Sons Construction, Inc., 461 F.3d at 840, which also involved a construction dispute between two private entities. Specifically, the court held that SNC would be required to prove the following elements in order to prevail on its constructive acceleration claim: (1) that SNC experienced an excusable delay entitling it to a time extension; (2) that SNC properly requested the extension; (3) that ATK failed or refused to grant the requested extension: (4) that ATK demanded that the project be completed by the original completion deadline despite the excusable delay; and (5) that SNC actually accelerated the work in order to complete the project by the original completion date and incurred added

costs as a result. <u>See</u> <u>Murdock</u>, 461 F.3d at 840 (referred to by the parties in this case as the "Murdock test").[7]

In moving for judgment as a matter of law, ATK argues, as it did on summary judgment and at trial, that "post-denial notice of a constructive order to accelerate" is an essential element of constructive acceleration and, thus, that the <u>Murdock</u> test is incomplete. (ATK Br. in Supp. of Mot. at 1-2.) ATK cites the United States Court of Appeals for the Federal Circuit's decision in <u>Fraser Constr. Co. v. United States</u>, 384 F.3d 1354 (Fed. Cir. 2004), in which the Court set forth five elements that must be satisfied in order to prevail on a constructive acceleration claim. For the fourth element, the Court stated that "the government [must] insist[] on completion of the contract within a period shorter than the period to which the contractor would be entitled by taking into account the period of excusable delay, <u>after which the contractor [must] notif[y] the government that it regarded the alleged order to accelerate as a constructive change to the contract</u>." <u>Id.</u> at 1361 (emphasis added). Relying on <u>Fraser</u> and other decisions involving claims against the United States, ATK maintains that "post-denial notice of a constructive order to accelerate" is "required by law." (ATK Br. in Supp. of Mot. at 1.)

------

[7] In <u>Murdock</u>, the Seventh Circuit relied upon the elements described by the Ohio Court of Appeals in <u>Sherman R. Smoot Co.</u>, 736 N.E. 2d at 78. The same test has been utilized by other courts, including the United States District Court for the Western District of Kentucky and the Court of Claims of Illinois. <u>See</u> <u>Envirotech</u>, 715 F. Supp. at 192; <u>Fru-Con Corp.</u>, 50 Ill. Ct. Cl. at 93. Likewise, treatises on construction law have set forth the same basic elements necessary to establish a claim for constructive acceleration. <u>See, e.g.,</u> <u>Construction Law</u> at P 6.12 ("The basic elements of a constructive acceleration claim are well established: (1) excusable delay; (2) notice to the defendant of the excusable delay and request for an extension of time; (3) refusal or failure to grant the requested extension within a reasonable time; (4) an express or implied order to accelerate; and (5) actual acceleration."); <u>Construction Delay Claims</u> at § 6.05 (same); <u>see also</u> Stephen B. Lesser & Daniel L. Wallach, <u>The Twelve Deadly Sins: An Owner's Guide to Avoiding Liability For Implied Obligations During the Construction of a Project</u>, The Construction Lawyer, 28 Constr. Lawyer 15, Winter 2008 (setting forth the same five elements necessary to prevail on a claim for constructive acceleration).

While the acceleration cases decided by the Federal Circuit and the Boards of Contract Appeals are instructive, the court is unable to concur with ATK's suggestion that they are controlling in the instant case, since they involve claims against the United States. As noted in several of the more recent constructive acceleration cases involving claims against the federal government, including Fraser, such claims against the United States are brought pursuant to the standard changes clause, which is required for most federal construction contracts, pursuant to 48 C.F.R. § 52.243-4. See Fraser, 384 F.3d at 1360 (noting that a claim for constructive acceleration "arises under the changes clause"); see also Azure v. United States, Case No. 96-5054, 1997 U.S. App. LEXIS 29365, at *7 (Fed. Cir. Oct. 24, 1997) ("Under the standard changes clause contained in this contract, the government may make a change to the contract, including an order to accelerate work, and make an equitable adjustment for the work.") (citing 48 C.F.R. § 52.243-4); Edge Constr. Co. v. United States, 95 Fed. Cl. 407, 421 (Fed. Cl. 2010) ("Acceleration – actual or constructive – is a basis upon which a contractor might be able to recover damages for unusually severe weather.") (citing 48 C.F.R. 52.243-4).

Section 52.243-4 of the Federal Acquisition Regulations specifically permits the contracting officer to issue a change order directing acceleration in the performance of the work, and expressly requires a contractor to show that it notified the contracting officer that it regarded any other written or oral communication causing acceleration as a change order. The regulation provides, in pertinent part, as follows:

(a)   The Contracting Officer may, at any time, without notice to the sureties, if any, by written order designated or indicated to be a change order, make changes in the work within the general scope of the contract, including changes –

(1)   In the specifications (including drawings and designs);

> (2)    In the method or manner of performance of the work;
>
> (3)    In the Government-furnished property or services; or
>
> (4)    Directing <u>acceleration</u> in the performance of the work.
>
> (b)    Any other written or oral order (which, as used in this paragraph (b), includes direction, instruction, interpretation, or determination) from the Contracting Officer that causes a change shall be treated as a change order under this clause; <u>provided that the Contractor gives the Contractor written notice stating</u> (1) the date, circumstances, and source of the order and (2) <u>that the Contractor regards the order as a change order</u>.

48 C.F.R. § 52.243-4 (emphasis added).  Courts and commentators have recognized that it is this regulation that provides the basis for the notice requirement referenced in <u>Fraser</u>.  <u>See, e.g.</u>, <u>Fru-Con Constr. Corp. v. United States</u>, 43 Fed. Cl. 306, 329, 335 n. 50 (Fed. Cl. 1999) (citing the contract provision based on 48 C.F.R. § 52.243-4 and emphasizing that "the contract required plaintiff to provide written notice if . . . it believed it was being directed to accelerate"); <u>Calfon Constr., Inc. v. United States</u>, 18 Cl. Ct. 426, 438 (Cl. Ct. 1989) ("The Changes clause states that if the contractor receives direction from the contracting officer that changes the contract and is not accompanied by a formal change order, the contractor must provide written notice to the contracting officer that it considers the order a change in the contract."); John Cibinic, Jr., Ralph C. Nash, Jr. & James F. Nagle, <u>Administration of Government Contracts</u> Ch. 4, § V (4th ed. 2006) (noting that 48 C.F.R. § 52.243-4(b) "requires written notice of constructive acceleration orders"); <u>Government Contracts: Law, Administration Procedure</u> § 28.300 (Walter Wilson ed.) (LexisNexis 2012) ("In the context of a construction contract, the contractor must also show that it notified the contracting officer within 30 days that the government's acceleration order was a constructive change.") (citing 48 C.F.R. § 52.243-4).

Unlike <u>Fraser</u> and the cases cited therein, the federal government is not a party to the

contract in the instant case, and there is no indication that the Contract is otherwise subject to

§ 52.243-4.  Accordingly, the court remains convinced that <u>Fraser</u> is not controlling in the instant

case, and that "post-denial notice of a constructive order to accelerate" is not "required by law" in

every action involving a claim of constructive acceleration.[8]  (ATK's Br. in Supp. at 1.)

Alternatively, ATK asks the court to rule, as matter of law, that the Contract, itself,

required SNC to provide written notice that it regarded ATK's actions as an acceleration order

and an ATK-directed change to the Contract.  (ATK's Br. in Supp. at 6.)  Having carefully

reviewed the applicable portions of the Contract, however, the court is unable to do so.  Unlike

48 C.F.R. § 52.243-4, which expressly addresses "changes . . . . [d]irecting acceleration in the

performance of the work," and which specifically requires a contractor to give "written notice . . .

that the Contractor regards [a constructive order to accelerate] as a change order," the relevant

provisions in the instant Contract do not include such language.  Instead, the only "ATK-Directed

Changes" referred to in the Contract are "written order[s]," by which ATK "make[s] changes

within the general scope of the types of services provided by the Contractor under this Contract."

(Contract at § 12.1.)  The provision further states that the Contractor "shall implement the change

---

[8] As the Court noted in <u>Fru-Con</u>, the effect of denying a justified time extension and, at the same time, holding the contractor to the original completion date, is easily perceived, especially in a case such as this, where the contractor faces the possibility of being responsible for liquidated damages if the project is not completed on time.  <u>Fru-Con</u>, 50 Ill. Ct. Cl. at 93.  In an attempt to avoid liquidated damages, the contractor will likely accelerate its performance.  <u>See Id.</u> ("The effect of such a position on a contractor is fairly obvious.  If liquidated damages are provided for in the contract, as was the case here, the contractor is under additional pressure because it does not know whether it will be found liable for liquidated damages."); <u>see also Norair Eng'g Corp. v. United States</u>, 666 F.2d 546, 549 (Ct. Cl. 1981) ("The pressure applied, even if it were merely implicit . . . is particularly strong where liquidated damages hover in the background.").

in accordance with the instructions from ATK." (Id.)  The court agrees with SNC that there is
nothing in this provision, or any other provision within Section 12, which expressly requires
SNC to provide "post-denial notice . . . that it interpreted ATK's actions as ordering
acceleration." (ATK Br. in Supp. of Mot. at 6.)  Accordingly, the court remains convinced that it
properly relied upon the Murdock test to instruct the jury at trial.

### B.    The Sufficiency of the Evidence

ATK also argues that the evidence was insufficient to satisfy the elements of constructive
acceleration that were included in the court's jury instructions.  For the following reasons, the
court concludes that ATK's evidentiary challenges are also without merit.

The court's final instructions on constructive acceleration read, in pertinent part, as
follows:

> To prevail on its acceleration claim, SNC must prove the following elements
> by a preponderance of the evidence:
>
> 1.   That SNC experienced an excusable delay entitling it to a time
>      extension under the contract;
>
> 2.   That SNC properly requested the extension;
>
> 3.   That ATK unreasonably failed or refused to grant the requested
>      extension;
>
> 4.   That ATK demanded that the project be completed by the original
>      deadline despite the excusable delay; and
> 5.   That SNC actually accelerated the work in response to an
>      unreasonable denial of the extension in order to complete the project
>      by the original deadline, and incurred additional costs.
>
> For purposes of the first element, I tell you that under the parties' contract,
> SNC was entitled to an extension of the time to complete the project, subject to other
> contractual requirements, if SNC experienced an unavoidable delay in completing the
> project on time that resulted from an event that was (1) beyond the control of SNC;

and (2) not the result of any action or inaction by SNC or those responsible to SNC, including its subcontractors.

The contract includes a list of events or circumstances that may provide a basis for an extension of the contract time if other contractual requirements are met. Included in the list is "unusually severe weather" that impacts the timely completion of the work required under the contract.

Unusually severe weather is severe weather that is unexpected based on recent weather patterns for the time of year at the particular location in question.

You must also decide whether SNC properly requested an extension of time. In this regard, you must determine what actions SNC was contractually required to take in order to request an extension of the contract time, and whether SNC complied with those requirements.

Additionally, for purposes of the fourth element, I tell you that you may find that ATK demanded that SNC complete the project within the original time for completion if ATK threatened to assess liquidated damages against SNC. Likewise, for purposes of the fourth element, I tell you that you may find it was proper for ATK to demand SNC to complete the project within the original time for completion if you find that SNC was not entitled to an extension of time to complete the project.

(Docket No. 92 at 19-21.)

In this case, the parties' Contract expressly permitted time extensions for "unusually severe weather," (Contract § 12.2), and it is undisputed that SNC encountered unusually severe weather while working on the NAC/SAC project. Indeed, SNC's weather expert, Thomas Patton, testified that the winter of 2009/2010 was the sixth coldest and second snowiest on record, with over 50 inches of snowfall in the Radford area from December 2009 through February 2010 and three long stretches of very cold arctic air. It is also undisputed that SNC notified ATK on February 25, 2010 that severe winter weather was impacting its performance; that SNC formally requested a 30-day extension of time; and that, eighteen days later, ATK denied the request for extension of time and threatened to impose liquidated damages if the work

29

was not completed by the date set forth in the Contract. Additionally, ATK does not dispute that SNC actually accelerated its performance.

While ATK argues that SNC did not properly request a time extension, and that the request was not unreasonably denied, both of these issues were squarely presented to the jury for consideration. The court concluded, on summary judgment, that the Contract was ambiguous as to the extent of notice required to obtain an extension of time under the Contract, and that the jury must decide whether SNC properly requested an extension. At trial, as set forth above, the jury was specifically instructed that it had to determine what actions SNC was contractually required to take in order to request an extension of the Contract time, and whether SNC complied with those requirements. The jury was also specifically instructed that it had to determine whether ATK unreasonably failed or refused to grant the requested extension.

The jury ultimately found in SNC's favor on both of these issues, and the court is unable to conclude that there was no legally sufficient evidentiary basis for the jury to do so. A reasonable jury could have adopted SNC's interpretation of the various notice provisions and concluded that SNC properly requested an extension of time on the basis of the unusually severe winter weather. Likewise, based on the evidence presented, a reasonable jury could have found that ATK unreasonable failed or refused to grant the requested extension.

For these reasons, the court remains convinced that ATK is not entitled to judgment as a matter of law on SNC's acceleration claim. Accordingly, ATK's renewed motion under Rule 50(b) will be denied.

## Conclusion

For the reasons stated, SNC's Rule 50(b) motion will be granted in part and denied in part, and ATK's Rule 50(b) motion will be denied. In accordance with the court's rulings, the jury verdict and judgment in favor of ATK on its mass notification claim will be set aside and judgment will be entered in favor of SNC on that claim.

The Clerk is directed to send certified copies of this memorandum opinion and the accompanying final order to all counsel of record.

ENTER: This _3rd_ day of May, 2012.

_____

Chief United States District Judge